718 So.2d 280 (1998)
PONCE INVESTMENTS, INC., Appellant/Cross-Appellee,
v.
FINANCIAL CAPITAL OF AMERICA, etc., et al., Appellees/Cross-Appellants.
No. 97-3041.
District Court of Appeal of Florida, Third District.
September 9, 1998.
Rehearing Denied October 21, 1998.
Eckert Seamans Cherin & Mellott and Stanley B. Price and Harvey W. Gurland, Jr. and Eileen Ball Mehta, Miami, for appellant.
Rosenberg, Reisman & Stein and Gary M. Stein, Miami, for appellees.
Before SCHWARTZ, C.J., FLETCHER, J., and SMITH, LARRY G., Senior Judge.
FLETCHER, Judge.
Ponce Investments, Inc. [Purchaser] appeals, and Financial Capital of America, Ronald R. Molina, and Raymond E. Molina, as general partners of Palm Plaza Partners, Ltd. [Sellers], cross-appeal a final judgment in an action arising from a failed real estate transaction.
The Sellers owned real property located on U.S. 1 and SW 168th Street on which stood a 40,000 square foot building housing a warehouse and retail stores. The building was extensively damaged by Hurricane Andrew and the Sellers decided to sell the property rather than rebuild it. The Purchaser entered *281 into an agreement to purchase the property, intending to renovate the property and use it for its corporate headquarters.
Soon after execution of the contract, two significant problems arose. An environmental impact study revealed contaminants on the property which required cleanup before a loan commitment could be issued. The Sellers also received notice from the Dade County Unsafe Structures Board that the property would be demolished and cleared if the damaged structure were not secured and cleared of debris within 120 days. The parties entered into an addendum to resolve these problems. As to the environmental cleanup, the addendum provided:
"[T]he parties agree that the Purchasers shall use their own equipment and personnel at their cost in order to remedy this situation. The Seller shall pay half (½) of the cost of said environmental `clean-up' up to a maximum amount of thirty-four [thousand] ($34,000.00) dollars. Should the costs of the environmental clean-up exceed sixty-eight thousand ($68,000.00) dollars, then all such funds above that amount shall be at the sole cost and expense of the Purchaser."
With regard to the demolition of the building, the addendum provided:
"The Seller will advance up to twenty thousand ($20,000.00) dollars to the Purchaser for selective demolition work, clean-up and the like to make the remaining structures safe in order for the Purchaser to commence its reconstruction of the subject property. Said funds, up to $20,000.00, will be reimbursed to the Seller by the Purchaser at the time of closing. In the event that a closing is not had, then Purchaser shall deliver unto Seller release of liens for all such work performed in order to accomplish the purposes of this paragraph."
The addendum also stated that the Sellers had advanced $5,000.00 to the Purchaser to cover the cost of engineering and architectural plans and processing fees for reconstruction, which was to be reimbursed to the Sellers at time of closing. The parties further agreed that if the building was demolished by the County, the Purchaser had the option of canceling or proceeding to close under the terms of the contract and addendum.
The Purchaser began work on the environmental cleanup, removal of debris and reconstruction of the building, expending $23,900 for the environmental cleanup and over $136,000 for debris removal and reconstruction. As fate would have it, the County again threatened to demolish the building on the property. The Purchaser advanced $2,700 to the Sellers so they could retain legal counsel to seek a court order enjoining demolition. The Purchaser also agreed to advance to the Sellers money for property taxes and carrying costs. In return, the Sellers executed a promissory note and mortgage for up to $150,000, after receiving $89,691.69 from the Purchaser.
Notwithstanding the parties' efforts, the County demolished the building and cleared the site, after which the Sellers attempted to convince the Purchaser to close without further negotiations. This the Purchaser failed to do. The Sellers ultimately terminated the contract and proceeded to find another buyer. The Purchaser then recorded a statutory claim of lien against the property in the amount of $163,517.93 (which was later reduced at trial to $136,000). The Purchaser's statutory lien included amounts for attorney's fees, overhead, and items previously paid for pursuant to the addendum agreement. The Sellers brought suit to discharge the lien and to recover damages for a fraudulent lien and for slander of title. The Purchaser counterclaimed seeking to foreclose the mortgage and the statutory lien, to enforce an equitable lien, and to recover damages for breach of contract and unjust enrichment. After a non-jury trial, the court granted the Purchaser's mortgage foreclosure and denied the Purchaser's other claims. The court denied the Sellers' claims for fraudulent lien and slander of title. The court, however, went on to award the Purchaser only a net amount of $39,771.46 based on the court's calculation that the Purchaser was owed $89,691.69 in principal and $8,204.74 in interest under the mortgage for a total of $98,896.43. From this amount the *282 court deducted $58,124.97 for taxes, interest on taxes, management, and other items.[1]
The Purchaser raises several issues on appeal, including its contention that the court failed to properly calculate the interest due under the mortgage. There is no dispute that the Sellers failed to make the payment required under the note and mortgage. Therefore, the trial court should have awarded the Purchaser interest at the default rate of 18% from the date of default, not 10% interest, the non-default rate.[2] As to the Purchaser's other issues, however, we find them to be without merit.
The Sellers argue on cross-appeal that there is no record support for the trial court's negative ruling on their claim that the Purchaser's statutory lien was fraudulent, as defined by section 713.31(2)(a), Florida Statutes (1995).[3] We agree. The competent substantial evidence below clearly establishes that the lien filed by the Purchaser was fraudulent. The Purchaser included in its statutory lien amounts for items which, under any view of the case, were not properly part thereof. As previously noted, amounts included attorney's fees, overhead, and items previously paid for. The trial court's conclusion that the Purchaser acted on good faith, thereby precluding the finding of a fraudulent lien, see section 713.31(2)(b), Florida Statutes (1995), is simply not supported by the record. The Sellers were therefore entitled to a discharge of the lien and to damages as set forth in section 713.31(2)(c), Florida Statutes (1995).[4]See Delta Painting, Inc. v. Baumann, 710 So.2d 663 (Fla. 3d DCA 1998); Viyella Co. v. Gomes, 657 So.2d 83 (Fla. 3d DCA 1995); Martin v. Jack Yanks Constr. Co., 650 So.2d 120 (Fla. 3d DCA), rev. denied, 659 So.2d 1087 (Fla.1995).
We are unable to determine the trial court's intent with regard to the Sellers' additional claim of slander of title. On remand the trial court shall revisit that issue to clarify it, although it may be that any damages recoverable under such claim would be subsumed by the Sellers' fraudulent lien claim.
Accordingly, we reverse the final judgment and remand this cause for further proceedings consistent with this opinion.
NOTES
[1] We are unable to ascertain the trial court's basis for the reduction amounts. They seem to be for items recoverable under the slander of title claim which the trial court rejected.
[2] The trial court used the non-default rate on the theory that the Purchaser's statutory lien prevented the Sellers from marketing the property, therefore the Purchaser caused the default. The Purchaser, however, had the right to pursue all of its remedies without waiving the default rate.
[3] Which reads:

"Any lien asserted under this part in which the lienor has willfully exaggerated the amount for which such lien is claimed or in which the lienor has willfully included a claim for work not performed upon or materials not furnished for the property upon which he seeks to impress such lien or in which the lienor has compiled his claim with such willful and gross negligence as to amount to a willful exaggeration shall be deemed a fraudulent lien."
[4] Which reads:

"(c) An owner against whose interest in real property a fraudulent lien is filed, or any contractor, subcontractor, or sub-subcontractor who suffers damages as a result of the filing of the fraudulent lien, shall have a right of action for damages occasioned thereby. The action may be instituted independently of any other action, or in connection with a summons to show cause under s. 713.21, or as a counterclaim or cross-claim to any action to enforce or to determine the validity of the lien. The lienor who files a fraudulent lien shall be liable to the owner or the defrauded party in damages, which shall include court costs, clerk's fees, a reasonable attorney's fee for services in securing the discharge of the lien, the amount of any premium for a bond given to obtain the discharge of the lien, interest on any money deposited for the purpose of discharging the lien, and punitive damages in an amount not exceeding the difference between the amount claimed by the lienor to be due or to become due and the amount actually due or to become due."